1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LUIS AMPARAN RODRIGUEZ,              No.  2:12-cv-2260 TLN GGH P

12                  Petitioner,

13        v.                              FINDINGS AND RECOMMENDATIONS

14   DAVE DAVEY,

15                  Respondent.

16

17   INTRODUCTION

18        Petitioner is a state prisoner proceeding with counsel on an amended petition for a writ of

19   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction

20   entered against him on July 14, 2009 in the Yolo County Superior Court on charges of first

21   degree murder (Cal. Penal Code §187(a)).  He seeks federal habeas relief on the following

22   grounds: (1) petitioner's conviction of first-degree murder is not supported by sufficient evidence

23   to show that he acted with premeditation and deliberation; and (2) the trial court erred by

24   instructing petitioner's jury that the degree of the crime committed by petitioner as an aider and

25   abettor was a function of the degree of the crime committed by Madrigal (the perpetrator), and

26   that Madrigal was guilty of premeditated murder.[1][2]  (ECF No. 37.)  Upon careful consideration of

27   _____

28   [1]  This claim contains the instruction sub-claims discussed at length herein.
     [2]  The ineffective assistance of counsel claim raised in the amended petition as a third and

1  the record and the applicable law, the undersigned will recommend that petitioner's application

2  for habeas corpus relief be granted on the second claim, jury instruction error.

3  BACKGROUND

4      In its unpublished memorandum and opinion affirming petitioner's judgment of

5  conviction on appeal, the California Court of Appeal for the Third Appellate District provided the

6  following factual summary:

> During the afternoon of July 8, 2007, [petitioner] went to the house of Benigno ("Benny") Sanchez in Sacramento, California. There, [petitioner] hung out with a number of people including Sanchez and Jose David Madrigal. Eventually everyone left the house, except [petitioner], Sanchez, and Madrigal. Around 9:00 p.m., the victim, Alexandra Cerda, showed up at the house and accepted a beer from [petitioner].

> Around 10:00 p.m., [petitioner] offered Cerda a ride in his van. Cerda accepted, and [petitioner] dropped her off at a gas station at South Watt Avenue and Fruitridge Road. [Petitioner] turned around and drove back to Sanchez's house.

> When [petitioner] arrived at Sanchez's house at 10:30 p.m., Madrigal told him that they should go to pick up Cerda. [Petitioner] asked what Madrigal was going to do, and Madrigal responded that he wanted to see if she would have sex with him.

> [Petitioner] and Madrigal drove to the location where Cerda had been dropped off, and they found her nearby. [Petitioner] pulled the van over. Madrigal opened a door on the side of the van and told Cerda to get in. Madrigal also told Cerda they would take her home.

> Cerda got in and sat in the captain's chair behind the front passenger seat. Madrigal stated he would also ride in the back and asked [petitioner] to turn the volume of the music up. Madrigal got into the captain's chair behind the driver's seat and asked Cerda to have sex with him. Cerda told Madrigal that she did not want to have sex with him. Cerda and Madrigal did not argue.

> Madrigal began stabbing Cerda with a 12–inch knife. [Petitioner] testified that Madrigal stabbed Cerda "fast and hard." Cerda screamed as Madrigal stabbed her repeatedly for about 10 minutes while she sat in the seat. Cerda pleaded for Madrigal not to hurt her.

> At some point during the attack, Cerda seemed to be able to turn the knife back on Madrigal so that Madrigal sustained a deep cut on his

---

alternative claim to the instructional error claim, was done so in the event that the second claim was deemed unexhausted.  As the second claim is exhausted and respondent concedes there are no issues of procedural default and this claim is moot, petitioner has agreed in his reply that this third claim need not be addressed.

2

hand. Madrigal knocked her to the floor of the van and kicked her to keep her down. Madrigal stabbed her repeatedly in the stomach.

An autopsy revealed that Cerda was stabbed approximately 120 times. She had been stabbed so many times that "an exact count was difficult to come to." The wounds ranged from shallow to very deep. Among the many wounds on Cerda's body were: a slash on her scalp that was four and one-half inches long and one and one-quarter inches deep; a three-inch-long stabbing cut from the victim's temple to left upper lip; approximately 48 shallow stab wounds on Cerda's left torso from the armpit to the upper hip; dozens of "defensive wounds" on Cerda's arms; a stab wound that punctured her left lung; and multiple neck wounds including a wound that punctured her left jugular vein. The stab wounds puncturing Cerda's jugular vein and left lung each would have been fatal. The jugular wound would have been fatal in approximately five minutes while the lung puncture, by itself, would have caused death in approximately 30 to 45 minutes. All but a few of the 120 stab wounds were inflicted while Cerda was alive. Cerda's body also displayed several contusions, which were consistent with being kicked.

Cerda's injuries were also consistent with a 10–minute struggle during which the victim would have experienced pain from the stab wounds.

[Petitioner] initially testified that he did not hear or see any of the attack occurring immediately behind him. However, he eventually admitted hearing Cerda scream. When [petitioner] looked back, Madrigal had already stabbed her several times. Even so, Cerda was still alive. During the 10 minutes that Madrigal stabbed Cerda, [petitioner] kept driving the van.

After the attack ended, [petitioner] drove toward Highway 50. Once on Highway 50, Madrigal opened the doors and got ready to push the body out of the van as they approached the Highway 99 interchange. [Petitioner] saw that the doors were covered with blood and told Madrigal to close them. They quickly decided to dump Cerda's body at the river instead.

As [petitioner] drove down Old River Road, Madrigal threw Cerda's body out of the van while it was still moving. Cerda was already dead. The van "peeled out" as [petitioner] quickly accelerated to get away.

[Petitioner] and Madrigal went to Eloise Velasquez's house, where Madrigal had been staying for several days. They arrived in the early morning hours of July 9. [Petitioner] saw that the rear interior of the van was soaked with blood. [Petitioner] and Madrigal asked Velasquez for water to wash out the van. The men used laundry detergent and water to clean the inside of the van. Velasquez used peroxide to clean a cut on Madrigal's hand.

[Petitioner] and Madrigal stayed at the house until 10:00 a.m. on July 9, 2007. They decided to head back to Sanchez's house and

3

1

2

ended up walking part of the way because [petitioner's] van broke down.

3

4

5

Earlier that morning, Brenda Gage was driving along Old River Road when she saw Cerda's body lying under a tree on the side of the road. Beside the body, Gage saw several objects: a 40–ounce bottle of beer; a CD insert; and a small black case. Sheriff's deputies would also find a black engine cowling that belonged to a Chevrolet or GMC van.

6

7

8

9

10

The detectives began to canvas areas that Cerda frequented. Based on a tip, the detectives began to look for a blue van that had frequently been seen at Sanchez's house prior to Cerda's disappearance. On July 11, 2010, two detectives spotted a blue van that matched the description given in the tip. The unoccupied van was parked at a McDonald's on the corner of Power Inn Road and 33rd Avenue. About a minute later, [petitioner] appeared, got in the van, and drove off.

11

12

13

14

The detectives followed the van and conducted a traffic stop after [petitioner] failed to signal a turn. [Petitioner] was detained for questioning. During an interview with the detectives, [petitioner] admitted that the beer bottle and cowl were in his van at the time of the attack on Cerda. When shown a picture of Cerda, [petitioner] responded, "I was there, but I didn't kill her." [Petitioner]'s fingerprint was later identified on the bottle.

15

16

17

Throughout the interior of the van, the deputies found blood spatters that matched Cerda's DNA profile. Under the hood, a detective found that the engine's cowl was missing. After interviewing [petitioner], detectives went to Velasquez's house where they found many of Cerda's personal items in a nearby trash can. Several of the items had a dried red substance on them.

18

The defense presented no evidence.

19

People v. Rodriguez, No. C062857, 2011 WL 684608, at *1–3 (Cal. Ct. App. Feb. 28, 2011).[3]

20

21

22

23

24

Petitioner was convicted of first degree murder and received a prison term of 25 years to life.  (CT. 336.)  Petitioner appealed the conviction which was denied by the California Court of Appeal on February 28, 2011.  (Res't's Lod. Doc. 4.)  Subsequently, petitioner filed a petition for review with the California Supreme Court, which was denied on June 8, 2011.  (Resp't's Lod. Docs. 5, 6.)

25

26

On August 22, 2012, petitioner filed his pro se federal petition for writ of habeas corpus.

27

28

[3] The Court of Appeal references petitioner's "testimony;" no such testimony took place at trial. The Court of Appeal must be referring to a pre-trial statement given by petitioner to the police which was read at trial.

4

1   (ECF No. 1.)  Respondent moved to dismiss based on an unexhausted claim.  The motion was

2   vacated without prejudice, and petitioner was appointed counsel, after which petitioner filed his

3   first amended petition alleging the claims set forth above.  (ECF No. 37.)

4          In conjunction with his first amended petition, petitioner filed a motion for stay and

5   abeyance pursuant to Rhines v. Weber, 544 U.S. 269, (2005), in order to permit exhaustion of

6   Claim Three for ineffective assistance of counsel.[4]  (ECF No. 38.)  The undersigned

7   recommended that petitioner's motion be granted, and this recommendation was adopted by the

8   district court.  (ECF Nos. 44, 45.)  The California Supreme Court denied the claims raised in the

9   exhaustion petition without comment.  (ECF No. 46.)  On December 11, 2014, petitioner notified

10  the court that the California Supreme Court had ruled upon the exhaustion petition and that all

11  claims were now exhausted.  (ECF No. 46.)  Accordingly, the stay was lifted on December 18,

12  2014.  (ECF No. 47.)  Respondent filed a motion to dismiss on the grounds that the newly

13  exhausted claims were time-barred and did not relate back, on April 29, 2015, (ECF No. 56),

14  which was denied for the most part by findings and recommendations issued October 6, 2015, and

15  adopted on December 8, 2015.  (ECF Nos. 69, 72.)  Only the first sub-claim of Claim 2, regarding

16  judicial notice, was dismissed.  Id.  An answer to the amended petition was filed on May 9, 2016,

17  followed by a reply on July 13, 2016.

18  DISCUSSION

19          I.     AEDPA STANDARDS AND JUDICIAL REVIEW

20          The statutory limitations of federal courts' power to issue habeas corpus relief for persons

21  in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

22  Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

23          An application for a writ of habeas corpus on behalf of a person in
            custody pursuant to the judgment of a State court shall not be
24          granted with respect to any claim that was adjudicated on the merits
            in State court proceedings unless the adjudication of the claim-
25
            (1) resulted in a decision that was contrary to, or involved an
26          unreasonable application of, clearly established Federal law, as

27  _____

28  [4]  Petitioner later exhausted some supplemental instructional error sub-claims in addition.  See ECF No. 69.

5

1    determined by the Supreme Court of the United States; or
2    (2) resulted in a decision that was based on an unreasonable
     determination of the facts in light of the evidence presented in the
3    State court proceeding.

4    For purposes of applying § 2254(d)(1), clearly established federal law consists of holdings

5    of the United States Supreme Court at the time of the last reasoned state court decision.

6    Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir.2013) (citing Greene v. Fisher, ––– U.S. –––

7    –, ––––, 132 S.Ct. 38, 44 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir.2011) (citing

8    Williams v. Taylor, 529 U.S. 362, 405–06, 120 S.Ct. 1495 (2000)).  Circuit precedent may not be

9    "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal

10   rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, ––– U.S. ––––, ––––,

11   133 S.Ct. 1446, 1450 (2013) (citing Parker v. Matthews, ––– U.S. ––––, ––––, 132 S.Ct. 2148,

12   2155 (2012)).  Nor may it be used to "determine whether a particular rule of law is so widely

13   accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be

14   accepted as correct.  Id.

15   A state court decision is "contrary to" clearly established federal law if it applies a rule

16   contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

17   precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640, 123 S.Ct.

18   1848 (2003).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court

19   may grant the writ if the state court identifies the correct governing legal principle from the

20   Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

21   case.[5]  Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003); Williams, 529 U.S. at 413;

22

23   [5] The undersigned also finds that the same deference is paid to the factual determinations of state
     courts.  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
24   overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
     presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,
25   384 F.3d 628, 638 (9th Cir.2004)).  It makes no sense to interpret "unreasonable" in § 2254(d)(2)
     in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error
26   must be so apparent that "fairminded jurists" examining the same record could not abide by the
     state court factual determination.  A petitioner must show clearly and convincingly that the
27   factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct. 969, 974
     (2006).
28

6

1    Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir.2004).  In this regard, a federal habeas court "may

2    not issue the writ simply because that court concludes in its independent judgment that the

3    relevant state-court decision applied clearly established federal law erroneously or incorrectly.

4    Rather, that application must also be unreasonable." Williams, 529 U.S. at 412.  See also Schriro

5    v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933 (2007); Lockyer, 538 U.S. at 75 (it is "not

6    enough that a federal habeas court, in its independent review of the legal question, is left with a

7    'firm conviction' that the state court was 'erroneous.' ").  "A state court's determination that a

8    claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on

9    the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101, 131 S.Ct.

10   770 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004)).[6]

11   Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

12   must show that the state court's ruling on the claim being presented in federal court was so

13   lacking in justification that there was an error well understood and comprehended in existing law

14   beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103.

15          The court looks to the last reasoned state court decision as the basis for the state court

16   judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.2004).  If

17   the last reasoned state court decision adopts or substantially incorporates the reasoning from a

18   previous state court decision, this court may consider both decisions to ascertain the reasoning of

19   the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir.2007) (en banc).

20   "[Section] 2254(d) does not require a state court to give reasons before its decision can be

21   deemed to have been 'adjudicated on the merits.'" Harrington, 562 U.S. at 100.  Rather, "[w]hen

22   a federal claim has been presented to a state court and the state court has denied relief, it may be

23   presumed that the state court adjudicated the claim on the merits in the absence of any indication

24   or state-law procedural principles to the contrary." Id. at 784-85.  This presumption may be

25   overcome by a showing "there is reason to think some other explanation for the state court's

26

27   [6]  "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an
     *incorrect* application of federal law.'" Harrington, 562 U.S. at 101, citing Williams v. Taylor,
28   529 U.S. 362, 410, 120 S.Ct. 1495 (2000).

1   decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S.Ct.

2   2590 (1991)).  Similarly, when a state court decision on a petitioner's claims rejects some claims

3   but does not expressly address a federal claim, a federal habeas court must presume, subject to

4   rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, —— U.S. ——

5   –, ——, 133 S.Ct. 1088, 1091 (2013).

6   　　　When it is clear, however, that a state court has not reached the merits of a petitioner's

7   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

8   habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462

9   F.3d 1099, 1109 (9th Cir.2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir.2003).

10   　　　The state courts need not have cited to federal authority, or even have indicated awareness

11   of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362,

12   365 (2002).  Where the state court reaches a decision on the merits but provides no reasoning to

13   support its conclusion, a federal habeas court independently reviews the record to determine

14   whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

15   Thompson, 336 F.3d 848, 853 (9th Cir.2003).  "Independent review of the record is not de novo

16   review of the constitutional issue, but rather, the only method by which we can determine whether

17   a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no

18   reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

19   reasonable basis for the state court to deny relief."  Harrington, 562 U.S. at 98.

20   　　　A summary denial is presumed to be a denial on the merits of the petitioner's claims.

21   Stancle v. Clay, 692 F.3d 948, 957 & n. 3 (9th Cir.2012).  While the federal court cannot analyze

22   just what the state court did when it issued a summary denial, the federal court must review the

23   state court record to determine whether there was any "reasonable basis for the state court to deny

24   relief."  Harrington, 562 U.S. at 98.  This court "must determine what arguments or theories ...

25   could have supported, the state court's decision; and then it must ask whether it is possible

26   fairminded jurists could disagree that those arguments or theories are inconsistent with the

27   holding in a prior decision of [the Supreme] Court."  Id. at 786.  "Evaluating whether a rule

28   application was unreasonable requires considering the rule's specificity.  The more general the

1  rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" <u>Id.</u>

2  Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of

3  federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme

4  Court has cautioned that "even a strong case for relief does not mean the state court's contrary

5  conclusion was unreasonable." <u>Id.</u>, citing <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75, 123 S.Ct. 1166

6  (2003).

7       The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the

8  state court to deny relief.'" <u>Walker v. Martel</u>, 709 F.3d 925, 939 (9th Cir.2013) (quoting

9  <u>Harrington</u>, 562 U.S. at 98).

10      II.      SUFFICIENY OF EVIDENCE FOR PETITIONER'S CONVICTION FOR

11              PREMEDITATED MURDER

12              1.  <u>Insufficient Evidence Standard</u>

13      "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging

14  the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."

15  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir.2005).  Sufficient evidence supports a conviction

16  if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

17  could have found the essential elements of the crime beyond a reasonable doubt.  <u>Jackson v.</u>

18  <u>Virginia</u>, 443 U.S. 307, 319, 99 S.Ct. 2781 (1979). "After AEDPA, we apply the standards of

19  Jackson with an additional layer of deference." Juan H., 408 F.3d at 1274.  Moreover, petitioner's

20  challenge to the sufficiency of evidence based on credibility of the witnesses is not cognizable in

21  an insufficient evidence claim.

22              2.  <u>Aiding and Abetting Standards</u>

23      California law on aiding and abetting was set forth by the Court of Appeals in its opinion

24  on direct appeal.

25          "(1) A person aids and abets the commission of a crime when he or
            she, (i) with knowledge of the unlawful purpose of the perpetrator,
26          (ii) and with the intent or purpose of committing, facilitating or
            encouraging commission of the crime, (iii) by act or advice, aids,
27          promotes, encourages or instigates the commission of the crime."
            (People v. Cooper (1991) 53 Cal.3d 1158, 1164.)
28

9

1   (Res't's Lod. Doc. 1 at 8.)

2   As further elaboration, the undersigned adds:

> "All persons concerned in the commission of a crime, ... whether they directly commit the act constituting the offense, or aid and abet in its commission, ... are principals in any crime so committed." (Pen. Code, § 31; see *People v. Mendoza* (1998) 18 Cal.4th 1114, 1122-1123 [77 Cal.Rptr.2d 428, 959 P.2d 735]; *People v. Prettyman* (1996) 14 Cal.4th 248, 259-260 [58 Cal.Rptr.2d 827, 926 P.2d 1013].) Thus, a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts. (*Ibid.*) Because aiders and abettors may be criminally liable for acts not their own, cases have described their liability as "vicarious." (E.g., *People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392].) This description is accurate as far as it goes. But, as we explain, the aider and abettor's guilt for the intended crime is not entirely vicarious. Rather, that guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state.
>
> It is important to bear in mind that an aider and abettor's liability for criminal conduct is of two kinds. First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted." (*People v. Prettyman*, supra, 14 Cal.4th at p. 260.)
>
> …
>
> [O]utside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator. "To prove that a defendant is an accomplice ... the prosecution must show that the defendant acted 'with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' ([*People v. Beeman* (1984) 35 Cal.3d 547,] 560 [199 Cal.Rptr. 60, 674 P.2d 1318], italics in original.) When the offense charged is a specific intent crime, the accomplice must 'share the specific intent of the perpetrator'; this occurs when the accomplice 'knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.' (Ibid.)" (*People v. Prettyman*, supra, 14 Cal.4th at p. 259.)1 What this means here, when the charged offense and the intended offense-murder or attempted murder-are the same, i.e., when guilt does not depend on the natural and probable consequences doctrine, is that the aider and abettor must know and share the murderous intent of the actual perpetrator.

<u>People v. McCoy</u>, 25 Cal.4th 1111, 1116-1117 (2001).  In the underlying case, petitioner was prosecuted under the first theory; he was not prosecuted under the natural and probable

1  consequences doctrine.  (Mot. to Dismiss, Res't's Lod. Doc. 1 at 16.)

2           2.  State Law on Murder

3       In this case, petitioner was convicted of (aiding and abetting) first degree murder in

4  violation of California Penal Code § 187, which states:  "(a) Murder is the unlawful killing of a

5  human being, or a fetus, with malice aforethought."  Malice is then defined as follows:

6           Such malice may be express or implied. It is express when there is
            manifested a deliberate intention unlawfully to take away the life of
7           a fellow creature. It is implied, when no considerable provocation
            appears, or when the circumstances attending the killing show an
8           abandoned and malignant heart.

9           When it is shown that the killing resulted from the intentional doing
            of an act with express or implied malice as defined above, no other
10          mental state need be shown to establish the mental state of malice
            aforethought. …
11

12  Cal. Penal Code § 188.  Implied malice exists "when a defendant is aware that he is engaging in

13  conduct that endangers the life of another."  People v. Cravens, 53 Cal.4th 500, 507 (2012).

14      Second degree murder contains the same elements as first degree murder, but without the

15  additional elements of premeditation and deliberation, which first degree murder requires.  People

16  v. Sandoval, 62 Cal.4th 394, 424 (2015).

17           2.  Analysis

18      Petitioner asserts that insufficient evidence existed for his conviction for first degree,

19  premeditated and deliberated murder (aiding and abetting).  The conclusion that sufficient

20  evidence existed to demonstrate that petitioner aided and abetted a premeditated and deliberate

21  murder was AEDPA reasonable.  Petitioner's claim here is based upon the mistaken premise that

22  because petitioner had no knowledge that Madrigal was going to murder Cerna, prior to the time

23  the stabbing commenced, a fact undisputed even by the Court of Appeal's own opinion, he could

24  not have aided a premeditated murder.

25      Petitioner is mistaken because it is not the commencement of felonious acts which may

26  lead to a victim's death which constitutes the time at which a murder was committed; there is

27  simply no murder until the victim dies whatever the nature of the preceding acts.  Thus, the

28  manner of killing itself may demonstrate the required premeditation, especially in cases where the

                                      11

1   ultimate killing may take a relatively long time and is occasioned by repeated acts.

2         Finally, and most tellingly, the evidence shows that Walsh was strangled with a
3         rope and that her death from asphyxiation would have taken between five and
          eight minutes. "Ligature strangulation is in its nature a deliberate act." (*People v.*
4         *Bonillas* (1989) 48 Cal.3d 757, 792, 257 Cal.Rptr. 895, 771 P.2d 844.) This
5         prolonged manner of taking a person's life, which requires an offender to apply
          constant force to the neck of the victim, affords ample time for the offender to
6         consider the nature of his deadly act. "A rational finder of fact could infer that [this
          manner of killing] demonstrated a deliberate plan to kill her." (*People v. Davis*
7         (1995) 10 Cal.4th 463, 510, 41 Cal.Rptr.2d 826, 896 P.2d 119.)

8

9   People v. Hovarter, 44 Cal 4th 983, 1019-1020 (2008) (discussing whether sufficient evidence

10  existed with respect to premeditated murder)[7]

11        Accordingly, if in this prolonged time period of repeated acts, a person, not the

12  perpetrator, acquires knowledge that a murder is likely to happen, that person may also be aware

13  that the perpetrator/killer is premeditating that murder by the very nature of the perpetrator's acts,

14  and the length of time it is taking to kill the victim.  If that person then aids (or continues to aid)

15  the ultimate killing, that person (aider and abettor) may legally have done so with knowledge that

16  a premeditated murder was taking place, i.e., the acts constituting premeditation/deliberation were

17  unfolding before the aider's eyes.  In this case, over a relatively long period of time, the victim

18  Cerna was stabbed multiple times, screaming and resisting.  Yet, petitioner continued to aid the

19  perpetrator/killer by his continued facilitation of the stabbing, i.e., he kept on driving the car

20  thereby facilitating the continued stabbing.  Moreover, other acts, even those occurring after the

21  death of the victim, and performed by petitioner, such as disposing of the body, could reflect on

22  his intent/awareness at the time the killing was taking place.

23        The Court of Appeal found:
          In this case, the evidence amply sufficed to prove that the perpetrator—Jose David
24        Madrigal—killed the victim in a manner that was willful, deliberate, and

25

26  [7]  However, the fact that the culmination of the murder is taking a long time does not *mandate* a
    finding of premeditation and deliberation. See  People v. Bradford, 15 Cal. 4th 1229, 1345
27  (1997); People v. Rowland, 134 Cal. App. 3d 1 (1982).  Therefore, whether petitioner was aiding
    and abetting a premeditated/deliberate, first degree murder, as opposed to a simple intent to kill
28  second degree murder, was a live issue in his trial.

premeditated. Madrigal brought along a 12–inch, fixed-blade knife when he and defendant went to look for Cerda. Madrigal began stabbing Cerda only a short time after she got into the van at Madrigal's bidding. Although Cerda purportedly turned down Madrigal's request for sex, they had not been arguing before he began to stab her. Madrigal stabbed Cerda "fast and hard" during the course of a vicious and gruesome 10–minute attack. The sheer number and type of stab wounds strongly supports the conclusion that Madrigal intended to kill Cerda. Indeed, Madrigal inflicted two wounds that would each have been fatal on its own: a deep stab that punctured Cerda's left lung and a wound that cut the jugular vein in her neck. Based on this evidence, defendant's contention that Madrigal's attack failed to demonstrate an intent to kill Cerda is devoid of merit.

A closer question is presented by the challenge to the sufficiency of the evidence of defendant's intent. The evidence indicated that defendant himself did not deliver any of the knife wounds to Cerda, nor did he cause her contusions by kicking her. Instead, defendant simply drove the van that picked up Cerda, was the scene of her death, and was the transportation to the isolated spot where her body was dumped. In assessing whether defendant's role in the killing proved his knowledge of Madrigal's purpose and his intent to commit, facilitate or encourage the crime, we consider his presence at the scene of the murder, his companionship with the perpetrator, and his conduct before and after the offense. (*People v. Campbell, supra*, 25 Cal.App.4th at p. 409; *In re Lynette G., supra*, 54 Cal.App.3d at p. 1094.)

The evidence suffices to show that defendant possessed the requisite knowledge and intent for a first degree murder conviction. Even if defendant was unaware of the plan to stab Cerda to death when she got into the van at Madrigal's invitation, defendant's conduct during the attack established the necessary mens rea.

Defendant was present throughout the entire time from the moment Madrigal asked for a ride to pick up Cerda, through the killing, at the time that they disposed of the body, and afterward when defendant and Madrigal attempted to clean the blood from the van. In short, defendant served as a companion to Madrigal throughout the course of the events surrounding Cerda's death.

Defendant's own testimony establishes that he heard Cerda scream in pain and plead with Madrigal to stop the attack. Defendant also saw Madrigal stabbing Cerda "fast and hard" while she was still alive. Without protest, evasive action, or any attempt to seek help, defendant drove the van while Cerda suffered 120 stab wounds over the course of 10 minutes.

1

2     Defendant saw the attack while Cerda was still alive, and he facilitated the fatal
      portion of the attack by driving according to Madrigal's instructions. By
3     continuing to drive the van during the attack, defendant cut off Cerda's only
      avenue of escape. She could not have reached safety from a moving vehicle—
4     especially once it began to drive on the highway. Moreover, defendant's continued
      driving prevented anyone outside the van from hearing, seeing, or interrupting the
5     killing. Defendant shared in the decision where to dump Cerda's body, and he
      drove to the remote location where her body was left.
6

7     This is not a case in which the defendant was an innocent bystander. Defendant's
      conduct in driving the van affirmatively thwarted any escape by the victim and
8     facilitated the killing by Madrigal. In short, defendant "played an affirmative
      supportive role in the [crime] and was not simply an innocent, passive, and
9     unwitting bystander." (*People v. Campbell, supra*, 25 Cal.App.4th at p. 410.) The
      jury was entitled to reject defendant's self-professed shock at the attack to
10    conclude that his complicity in every aspect of the events surrounding Cerda's
      death showed that he possessed knowledge of Madrigal's purpose and the intent to
11    facilitate the murder.
12

13    People v. Rodriguez, 2011 WL 684608 at *4-5.

14          Thus, petitioner's witnessing the killing as it unfolded for 10 gruesome minutes, i.e., the

15    very acts of Madrigal demonstrating premeditation throughout the ordeal, combined with

16    petitioner's support of those acts by his driving and post-killing support, demonstrates sufficient

17    evidence for petitioner's state of mind in aiding and abetting a premeditated murder.

18          However, while the evidence was sufficient, even the Court of Appeal believed it to be a

19    "close[] question." Indeed, the prosecution produced the only direct evidence of petitioner's

20    intent—a statement which in many ways demonstrated the opposite of what the prosecution was

21    attempting to prove.  Petitioner was entitled to have a fair shot at demonstrating to the jury that

22    his mind set was not that of full knowledge and facilitation of the perpetrators

23    premeditation/deliberation in the murder of Cerna.  Fn. 7 supra.  As set forth in the next section,

24    petitioner did not have that fair shot—his jury was given a mandatory presumption instruction--

25    i.e.,  Madrigal's premeditation was an undisputed fact in petitioner's trial, hence, petitioner was

26    "equally guilty."

27    ////

28
                                              14

III. <u>JURY INSTRUCTIONS</u>

      1. Background

Petitioner asserts there were several layers of instructional error that denied petitioner his right to a jury trial on the *mens rea* element of first degree murder.

Petitioner notes the following instructions were erroneous:

> (1) [T]he court's instruction of the jury pursuant to the prosecution's request for judicial notice at the end of its case that "it was not subject to dispute" that "Madrigal was indeed convicted of . . . first-degree, willful, deliberate, and premeditated murder."
>
> (2) [T]he court's instruction with former CALCRIM No. 400 that "[a] person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it."
>
> (3) [T]he court's instruction with a version of CALCRIM No. 521 modified by the prosecutor, which told jurors that Mr. Rodriguez's guilt of first degree murder was a function of whether they agreed that "the perpetrator [Madrigal] committed a willful, deliberate and premeditated murder" and that "the killing was first degree murder rather than a lesser crime."
>
> (4) [T]he court's instruction to the jurors—in response to their mid-deliberation question, "Why were we given a second choice of 2nd degree murder, since D.M. [David Madrigal] was convicted of 1st degree murder[?]"—that the State's burden in establishing Mr. Rodriguez's guilt of first-degree murder was proving that "the killing of Alexandra Cerda was first degree murder rather than second degree murder."
>
> (5) [T]he court's instruction to the jurors—in response to their final mid-deliberation question whether, after finding Mr. Rodriguez guilty of aiding and abetting murder, they still had the discretion to convict him of second-degree murder rather than first-degree murder—that, if they found the prosecution had proved that Mr. Rodriguez had "aided and abetted in the crime of murder, then the[y] must decide whether the murder was willful, deliberate, and premeditated (First Degree Murder), or Second Degree Murder."

(ECF Nos. 37-1 at 116-17, 61 at 19-20.) (internal citations omitted).

In findings and recommendations filed October 6, 2015, the undersigned declined to permit relation back of the first sub-claim regarding judicial notice, and that sub-claim was dismissed.  <u>See</u> ECF Nos. 69, 70.  Nevertheless, the findings, which were adopted in full by the district court, specifically stated:

15

The fact that the judicial notice sub-claim should be barred under the relation back doctrine does *not* mean that the fact of judicial notice of Madrigal's first degree murder conviction cannot be argued for its "prejudice" value when assessing the propriety of the instructions themselves, i.e., the other sub-claims. It most assuredly can be so argued as prejudice is assessed from a totality of the circumstances standpoint. This recommendation only means that "judicial notice" as a sub-claim *per se* should not be permitted as a timely claim.

(ECF No. 69 at 12.)

Claim 2 in the petition itself, and all of the sub-claims, here revolve about Sub-Claim 2 and can be synthesized into one claim concerning the instruction that an aider and abettor was "equally guilty" of the acts of which the perpetrator was convicted. The other instructions noted as "erroneous," are only erroneous, if at all, insofar as they modify or exacerbate this initial instruction.

In regard to Claim 2 as it existed prior to the addition and exhaustion of various sub-claims, the Court of Appeal addressed the jury instructions regarding petitioner's mental state, rejecting his argument, as set forth in the following portion of the opinion:

Former CALCRIM No. 400 (Aiding and Abetting)

The trial court instructed the jury pursuant to CALCRIM No. 400, as follows: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is *equally guilty* of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it." (Italics added.)

Defendant contends the italicized phrase "equally guilty" misstates the law because an aider and abettor may be subject to greater or lesser criminal culpability than a perpetrator. The point is well taken. The identified phrase erroneously failed to note, for example, that defendant could have been convicted of second degree murder even though Madrigal pled guilty to first degree murder. Nonetheless, we conclude the error is harmless when considering the jury instructions as a whole.

A.

In *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164, the appellate court found that former "CALCRIM No. 400's direction that '[a] person is *equally guilty* of the crime [of which the perpetrator is guilty] whether he or she committed it personally or aided and abetted the perpetrator who committed it' (CALCRIM

No. 400, italics added), while generally correct in all but the most exceptional circumstances, is misleading here and should have been modified." (Original italics and brackets.) Nonetheless, the *Samaniego* court concluded that the erroneous instruction was harmless beyond a reasonable doubt. (Id. at p. 1165.)

As did the *Samaniego* court, we consider whether the other instructions received by the jury on aider and abettor criminal liability cured the error in former CALCRIM No. 400. (*People v. Samaniego, supra*, 172 Cal.App.4th at pp. 1165–1166.) """In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole ... [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' (*People v. Yoder* (1979) 100 Cal.App.3d 333, 338.) 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' (*People v. Laskiewicz* (1986) 176 Cal.App.3d 1254, 1258.)" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

We conclude that the jury instructions, viewed as a whole, properly instructed the jury regarding aiding and abetting. The instructions required the jury to find that defendant had knowledge of Madrigal's purpose and intended to, and did, facilitate the crime. To this end, the trial court instructed the jury with CALCRIM No. 401 as follows: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime...." (Italics omitted.)

As the *Samaniego* court noted, error in instruction about an aider and abettor being "equally guilty" as a perpetrator is cured by instructing the jury on the requisite knowledge and intent for a first degree murder conviction. Here, as in *Samaniego*, the jury received CALCRIM No. 401, which made it "virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required. (*People v. Hughes* (2002) 27 Cal.4th 287, 371, [' " ' "[t]houghts may follow each other with ... great rapidity and cold, calculated judgment may be arrived at quickly" ' " ' ].) In the context of attempted murder, *People v. Lee* (2003) 31 Cal.4th 613, supports this conclusion. It stated: '*[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—*

*which means that the person guilty of attempted murder as an aider and abettor must intend to kill*. [Citation.] [¶] ... Where, as in the present case, the natural-and-probable-consequences doctrine does not apply, such an attempted murderer necessarily acts willfully, that is with intent to kill. In addition, he or she also necessarily acts with a mental state at least approaching deliberation and premeditation—concepts that entail " 'careful thought and weighing of considerations' " and " 'preexisting reflection' " [citation], as opposed to "mere unconsidered or rash impulse hastily executed" [citation]—because he or she necessarily acts with knowledge of the direct perpetrator's intent to kill and with a purpose of facilitating the direct perpetrator's accomplishment of the intended killing.' (Id. at p. 624 ....)" (*People v. Samaniego*, supra, 172 Cal.App.4th at p. 1166, italics changed.)

Defendant's jury also received CALCRIM No. 521, with which the trial court explained that "defendant has been prosecuted for first degree murder under the theory that he aided and abetted a willful, deliberate and premeditated murder." CALCRIM No. 521 then gave the jury a definition of the mental state required for first degree murder before concluding: "All other murders are of the second degree. [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder."

The trial court also gave CALCRIM No. 640, which instructed that defendant could be guilty of first degree murder, of second degree murder, or of no crime at all. In pertinent part, the instruction explained: "You will be given verdict forms for guilty and not guilty of first degree murder and second degree murder. [¶] You may consider these different kinds of homicide in whatever order you wish, but I can accept a verdict of guilty of a lesser crime only if all of you have found the defendant not guilty of the greater crime. [¶] ... [¶] 3. If all of you agree that the defendant is not guilty of first degree murder but also agree that the defendant is guilty of second degree murder, complete and sign the form for not guilty of first degree murder and the form for guilty of second degree murder. [¶] ... [¶] 5. If all of you agree that the defendant is not guilty of first degree murder and not guilty of second degree murder, complete and sign the verdict forms for not guilty of both."

Although federal due process guarantees encompass a defendant's right to have the jury properly instructed on the charged offense, we must nonetheless affirm if the error is harmless beyond a reasonable doubt. (*Carella v. California* (1989) 491 U.S. 263, 271 [105 L.Ed.2d 218, 225–226]; *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710–711].) Based on the proper instructions on aiding and abetting given in addition to former CALCRIM No. 400, we conclude the error of stating that an aider and abettor is "equally guilty" as a perpetrator is harmless beyond a reasonable doubt in this case.

People v. Rodriguez, No. C062857, 2011 WL 684608, at *6–8 (Cal. Ct. App. Feb. 28, 2011).

18

1          2.  Pertinent Legal Authority

2              a.  Law Pertaining to Jury Instruction Challenges

3          A challenge to a jury instruction solely as an error of state law does not state a claim

4  cognizable in a federal habeas corpus action.  See Estelle v. McGuire, 502 U.S. 62, 71–72, 112 S.

5  Ct. 475 (1991) (habeas corpus is unavailable for alleged error in the interpretation or application

6  of state law); see also Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); Middleton v.

7  Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  The standard of review for a federal habeas court "is

8  limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United

9  States."  Estelle, 502 U.S. at 62.  In order for error in the state trial proceedings to reach the level

10  of a due process violation, the error had to be one involving "fundamental fairness."  Id. at 73.

11  The Supreme Court has defined the category of infractions that violate fundamental fairness very

12  narrowly.  Id.

13          In order to establish a due process violation, petitioner must show both ambiguity in the

14  instructions and a "reasonable likelihood" that the jury applied the instruction in a way that

15  violates the Constitution, such as relieving the state of its burden of proving every element

16  beyond a reasonable doubt.  Waddington v. Sarausad, 555 U.S. 179, 190, 129 S. Ct. 823, 831

17  (2009).  The court must evaluate jury instructions in the context of the overall charge to the jury

18  as a component of the entire trial process.  See United States v. Frady, 456 U.S. 152, 169, 102 S.

19  Ct. 1584 (1982).

20          Importantly, however, a finding that the jury was likely to have applied the ailing

21  instruction in a way that violates the Constitution does not end the analysis.  The court must then

22  find that the jury misapprehension prejudiced the outcome of petitioner's trial, i.e., had a

23  substantial and injurious effect on the outcome of the trial.  Calderon v. Coleman, 525 U.S. 141,

24  146-147 (1998) referencing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); see discussion of

25  prejudice below.

26          Also, with respect to due process, a jury instruction laden with a mandatory presumption

27  and pertinent to the elements of the crime, is one that violates due process.  Sandstrom v.

28  Montana, 442 U.S. 510 (1979) (instruction that a person intends the ordinary consequences of

19

1    voluntary acts may have been interpreted as conclusive or as shifting the burden of persuasion).

2            Finally, with respect to jury instruction ambiguity, if a jury demonstrates confusion over

3    an ambiguous instruction, the trial court has a duty to rectify the confusion, and not just repeat the

4    ambiguous instructions (or exacerbate the problem).  Bollenback v. United States, 326 U.S. 607,

5    612-613 (1941) ("When a jury makes explicit its difficulties, a trial judge should clear them away

6    with concrete accuracy.")  See also McDowell v. Calderon, 130 F.3d 833 (9th Cir. 1997) (en

7    banc) impliedly overruled on other grounds, see Morris v. Woodford, 273 F.3d 826, 839 (fn.4)

8    (9th Cir. 2001).

9            Jury instruction error is not presumed prejudicial.  Even if it is determined that the

10   instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the

11   unconstitutional instruction had a substantial influence on the conviction and thereby resulted in

12   actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), which is whether the

13   error had substantial and injurious effect or influence in determining the jury's verdict. [8]  See

14   Hedgpeth v. Pulido, 555 U.S. 57, 61–62 (2008) (per curiam).

15           Because the Brecht standard "obviously subsumes" the more liberal AEDPA/Chapman

16   standard, the Ninth Circuit has held "we need not conduct an analysis under AEDPA of whether

17   the state court's harmlessness determination on direct review ... was contrary to or an

18   unreasonable application of clearly established federal law."  Pulido v. Chrones, 629 F.3d 1007,

19   1012 (9th Cir.2010) (citing Fry, 551 U.S. at 120).  See also Ortiz v. Yates, 704 F.3d 1026, 1038

20   and n. 9 (9th Cir.2012).  Instead, a federal habeas court is to apply the Brecht test without regard

21   for the state court's harmlessness determination.  Pulido, 629 F.3d at 1012 (citing Fry, 551 U.S. at

22   121–22); see also Merolillo v. Yates, 663 F.3d 444, 454–55 (9th Cir.2011) (Applying "'the

23   Brecht test without regard for the state court's harmlessness determination.'")

24           The Supreme Court has since clarified that Brecht incorporates the requirements of §

25   2254(d) (AEDPA).  Davis v. Ayala, 135 S. Ct. 2187, 2199 (2015).  Accordingly, if a state court

26   ────────────────────

27   [8]  This standard applies regardless of the error standard, if any, applied by the state court.  Fry v.
     Pliler, 209 Fed. Appx. 622, 624 (9th Cir. 2006), aff'd, 551 U.S. 112, 127 S. Ct. 2321 (2007),
     citing Bains v. Cambra, 204 F.3d 964, 976 (9th Cir.2000).

28

1  has determined that a trial error was harmless, "a federal court may not award habeas relief under

2  § 2254(d) unless the harmlessness determination itself was unreasonable." Id. (quoting Fry v.

3  Pliler, 551 U.S. 112, 119 (2007)) (emphasis in original).  "[R]elief is proper only if the federal

4  court has "grave doubt about whether a trial error of federal law had 'substantial and injurious

5  effect or influence in determining the jury's verdict.'"  Davis, 135 S. Ct. at 2197–98, (2015)

6  (quoting O'Neal v. McAninch, 513 U.S. 432, 436, 115 S.Ct. 992 (1995)).  The Brecht test will be

7  applied, but with due consideration of the state court's reasons for concluding the error was

8  harmless beyond a reasonable doubt.  Jones v. Harrington, 829 F.3d 1128, 1141-42 (9th Cir.

9  2016).

10         3. Analysis

11         Petitioner argues that the trial court committed several instructional errors, which, in

12  combination, required the jury to find that petitioner was guilty of first degree murder as an aider

13  and abettor because his co-defendant and direct perpetrator, Madrigal, was guilty of premeditated

14  murder.  In other words, the instructions directed the jury to find that petitioner's *mens rea* was a

15  function of the *mens rea* of Madrigal.  At the very least, petitioner contends that the instructions

16  were unconstitutionally ambiguous.

17         One of the analytical problems here is that the Court of Appeal did not precisely follow

18  the paradigm set out by the Supreme Court for ambiguous instructions.  Rather, it found that state

19  law error occurred in giving the "equally guilty" instruction, but that such was harmless beyond a

20  reasonable doubt because other instructions cured the ambiguity.  The undersigned will

21  nevertheless interpret the opinion as one finding that it was not likely that the jury was mislead by

22  the ambiguous instruction.  The other analytical problem is that the "equally guilty" instruction

23  was not ambiguous in itself, it was simply wrong, but rather only became ambiguous when

24  juxtaposed with the other instructions.  In either event, however, the appellate opinion is AEDPA

25  unreasonable.

26         The court provided the following instructions for first and second degree murder.  The

27  court informed the jury that defendant was being "prosecuted for first-degree murder under the

28  theory that he aided and abetted a willful, deliberate, and premeditated murder."  (RT. 641.)  The

21

1    court went through the elements for first degree murder, and then stated that "[a]ll other murders

2    are of the second degree."  The court instructed the jury that the People had the burden to prove

3    first degree murder beyond a reasonable doubt rather than a lesser crime, and if the prosecution

4    had not met its burden, then the jury must find the defendant not guilty of first degree murder.

5    The court further stated, "[f]or you to find a person guilty of the crime of murder as charged in

6    Count 1, either first- or second-degree murder, that person must not only intentionally commit the

7    prohibited act, but must do so with a specific intent and mental state."  (Id. at 642.)  The court

8    instructed pursuant to CALCRIM No. 640 that the jury would be given verdict forms for first and

9    second degree murder, and it could find defendant guilty of first degree murder or second degree

10   murder, or neither.  (CT. 268-69.)

11          Petitioner argues that former CALCRIM No. 400,[9] which instructed the jury that if it

12   found that petitioner was an aider and abettor of Madrigal, then his guilt was "equal" to

13   Madrigal's guilt, effectively directed the jury to return a verdict of first degree murder against

14   petitioner, making it impossible to return a verdict of second degree murder.  The Court of

15   Appeal found that although the giving of this instruction by itself was error, when viewed in

16   conjunction with the other instructions as a whole, the other instructions, in particular CALCRIM

17   401, served to cure the error.  CALCRIM No. 401, as given to the jury, stated:

18          To prove that the defendant is guilty of a crime based on aiding
            [sic]
19
20          People must prove that:

21          The perpetrator committed the crime;

22          The defendant knew that the perpetrator intended to commit the
            crime;

23          Before or during the commission of the crime; the defendant
24          intended to aid and abet the perpetrator in committing the crime;

25          AND

26          The defendant's word or conduct did in fact aid and abet the
            perpetrator's commission of the crime.

27   _____
     [9] CALCRIM No. 400 was later modified to remove any suggestion that the aider and abettor was
28   "equally guilty" to the perpetrator.  See Waddington v. Sarausad, 555 U.S. 179, 190-91 (2009).

                                                   22

1

> Someone *aids and abets* a crime if he or she knows the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

2

3

> If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

4

5

6

> If you conclude that that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether that defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him an aider and abettor.

7

8

9

(CT. 261.)[10]

10

CALCRIM 401 did not cure the error.  It did not correct the errors of the other instructions

11

which eliminated the need to find petitioner himself had the requisite intent level for first degree

12

murder, premeditation and deliberation, separate from the perpetrator's intent.  Furthermore, this

13

instruction only referred to "the crime," and did not specify or distinguish between first and

14

second degree murder, or even mention the word murder.  This allegedly curative instruction left

15

the intent level to be instructed by CALCRIM No. 521, which was limited to defining petitioner's

16

*mens rea* based on the perpetrator's *mens rea*.  See discussion *infra*.

17

Pursuant to People v. Nero, 181 Cal.App. 4th 504 (2010), the case cited by petitioner, the

18

language of CALCRIM No. 400 is misleading in using the term "equally guilty" because all of

19

the well-established legal authority set forth therein concludes that an aider and abettor can be

20

more or less guilty than the perpetrator, such that the *mens rea* of the accomplice must "float

21

free" and be proved independently.  Id. at 515-518.  In Nero, the jury asked very similar mid-

22

deliberation questions to those posed in this case, such as whether an aider and abettor could be

23

guilty of a lesser offense than the perpetrator.  The trial court, instead of answering in the

24

---

25

[10]  The court also gave Special Instruction #1 which stated:

26

> The prosecution must show that an aider and abettor formed the intent to aid and abet the perpetrator before or during the commission of the charged crime.  If the evidence shows that the defendant formed the intent to aid the crime after it was completed, then he is not liable for the crime committed by the perpetrator.

27

28

(CT. 263.)

23

1    affirmative, re-read CALJIC No. 3.00 [precursor to CALCRIM No. 400]. The appellate court

2    concluded it was federal constitutional error, and not harmless, stating:

3            [a]n instruction that omits or misdescribes an element of a charged
             offense violates the right to jury trial guaranteed by our federal
4            Constitution, and the effect of this violation is measured against the
             harmless error test of *Chapman v. California* (1967) 386 U.S. 18,
5            24[, 87 S.Ct. 824, 17 L.Ed.2d 705]. [Citation.]" (*Samaniego*, *supra*,
             172 Cal.App.4th at p. 1165, 91 Cal.Rptr.3d 874.)
6

7    Id. at 518-19. The Nero court concluded that it could not say, beyond a reasonable doubt, that the

8    defendant would have been found guilty of second-degree murder absent the error.

9            CALCRIM No. 520 was given here in regard to "murder with malice aforethought," but

10   did not explain the degrees of murder. It stated:

11           The defendant is charged in Count 1 with murder in violation of
             Penal Code section 187 under a theory of aiding and abetting. [See
12           Calcrim Instructions 400 and 401].

13           To prove that the defendant is guilty of this crime, the People must
             prove that:
14

15           The perpetrator committed an act that caused the death of
             Alexandra Cerda;

16           AND

17           When the perpetrator acted, he had a state of mind called malice
             aforethought.
18

19   (CT. 265.)

20           The court then explained the definition of malice aforethought, both express and implied,

21   as well as the meaning of natural and probable consequence and substantial factor. The court

22   concluded this instruction by stating, "[i]f you decide that the defendant has committed murder,

23   you must decide whether it is murder of the first or second degree." (Id.) The court failed to

24   explain, however, the differences between first and second degree murder, or that what had just

25   been instructed pertained only to second degree murder and did not include the crucial elements

26   of first degree murder.

27           The giving of modified version of CALCRIM 521 would normally serve to help cure the

28   ////

1    error in giving CALCRIM 400.  Nevertheless, this instruction was modified[11] and informed the

2    jury that petitioner's guilt was a function of whether it agreed that Madrigal committed first

3    degree murder.  (CT. 266.)  The Court of Appeals summarized CALCRIM No. 521 as follows:

> Defendant's jury also received CALCRIM No. 521, with which the
> trial court explained that "defendant has been prosecuted for first
> degree murder under the theory that he aided and abetted a willful,
> deliberate and premeditated murder."  CALCRIM No. 521
> then gave the jury a definition of the mental state required for first
> degree murder before concluding:  "All other murders are of the
> second degree.  [¶]  The People have the burden of proving beyond
> a reasonable doubt that the killing was first degree murder rather
> than a lesser crime.  If the People have not met this burden, you
> must find the defendant not guilty of first degree murder."

(Res't's Lod. Doc. 1 at 17.)  CALCRIM No. 521 as given referred to the intent of the perpetrator,

not the defendant, instructing in part:

> You may not find the defendant guilty of first degree murder unless
> all of you agree that the People have proved that the *perpetrator*
> committed a willful, deliberate and premeditated murder and the
> defendant aided and abetted a willful, deliberate and premeditated
> murder.
>
>   A.  Deliberation and Premeditation
>
> The *perpetrator* is guilty of first degree murder if the People have
> proved that he acted willfully, deliberately, and with premeditation.
> The *perpetrator* acted willfully if he intended to kill.   The
> *perpetrator* acted deliberately if he carefully weighed the
> consideration for and against his choice and, knowing the
> consequences, decided to kill.   The *perpetrator* acted with
> premeditation if he decided to kill before committing the act that
> caused death.

20   (CT. 266.) (emphasis added).

21         CALCRIM No. 521 incorrectly perpetuated the notion that solely the intent of the

22   perpetrator was to be used in deciding petitioner's guilt, not petitioner's own intent.  It further

23   repeatedly discussed the perpetrator, not petitioner, in furthering the erroneous notion that

24   petitioner's mens rea was to be based solely on that of the perpetrator.  As petitioner points out,

25   under California law, "a defendant charged with murder … cannot be held vicariously liable for

26   the mens rea of an accomplice.  People v. Concha, 47 Cal. 4th 653, 665 (2009) (citing McCoy,

27   ———————————————————
     [11]  The un-modified version of CALCRIM NO. 521 used the term "defendant" instead of
28   "perpetrator."

1   *supra*, 25 Cal.4th at p. 1118).[12]  The Court of Appeal failed to recognize the error in CALCRIM

2   No. 521 and its effect on the other instructional errors.  It is no wonder that the jury later asked

3   two questions concerning its confusion over Madrigal's first degree murder conviction and its

4   impact on petitioner's potential verdict.

5        Petitioner also objected to the court's use of an instruction upon request from the

6   prosecution, that judicial notice be given to the following information "which is not subject to

7   dispute," that "on January 9th, 2009, defendant Jose David Madrigal was indeed convicted of a

8   violation of Penal Code Section 187, which is described as first-degree, willful, deliberate, and

9   premeditated murder."  (RT. 599.)  This argument is no longer a sub-claim but may be pertinent

10  to highlight the issue here.  When combined with the "equally guilty" instruction, the jury had to

11  be mislead.  It was told that Madrigal was indisputably guilty of *premeditated* murder and that

12  petitioner was "equally guilty."  The jury was then faced with how to apply this one-way

13  direction with generalized instructions informing the jury that it could find petitioner guilty of

14  only second degree murder.  One could hardly invent a scenario which would be as likely to

15  mislead the jury.

16       There was no explanation of how that conviction came to be, such as the argument that

17  Madrigal pled guilty in order to avoid the death penalty or life without the possibility of parole, as

18  well as the prosecutor's argument in reliance on it.  Since Madrigal was not a witness at

19  petitioner's trial, petitioner had no opportunity to cross-examine him on these or other matters,

20  such as his intent level, motive, planning, or his involvement in the crime as compared to

21  petitioner's involvement.  More importantly, the court's taking judicial notice of Madrigal's

22  conviction with the court's added description of that conviction as "first-degree, willful,

23  premeditated, and deliberate murder," served to establish a *mens rea* that was the standard to

24  _____

25  [12]  Concha distinguished the crime of *attempted* murder, where it is not required that the aider and
    abettor personally act with premeditation and deliberation.  Id. at 665-66.  The Court of Appeal
26  relied on People v. Samaniego, 172 Cal.App.4th 1148, 1166 (2009), which in turn relied on
    People v. Lee, 31 Cal.4th 613, 624 (2003), a case involving attempted murder only, where the
27  accomplice is not required to personally act with premeditation and deliberation.  Lee held that a
    "mental state at least approaching deliberation and premeditation" is sufficient for attempted
28  murder.

1   which petitioner's mens rea would have to equate, according to the instructions given.  The

2   prosecutor seized on that instruction, attempting to cement in the jury's minds the concept that the

3   court had resolutely taken judicial notice of the notion of Madrigal's conviction for killing the

4   victim with an intent that was willful, deliberate and premeditated.  (RT. 645-46.)  The judicial

5   notice instruction increased the prejudice from the other instructions which are the subject of

6   petitioner's claims, all of which eliminated the prosecution's burden to independently prove

7   petitioner's intent level so long as he was found to have aided and abetted Madrigal in the crime.

8           Petitioner correctly contends that the jury's two mid-deliberation questions evidencing its

9   confusion support his claim.  First, the jury asked, "why were we given a second choice of 2nd

10  degree murder, since D.M. [co-defendant David Madrigal] was convicted of 1st degree

11  murder[?]"  (CT. 285.)  The court's response was the following instructions:

12          As explained in Instruction 520, in order to prove that a defendant
            is guilty of the crime of murder, the People must prove that:
13

14          1.   The perpetrator (Jose David Madrigal) committed an act that
                 caused the death of Alexandra Cerda;

15          AND

16          2.   When the perpetrator committed this act, he had a state of
                 mind called malice aforethought.
17

18          The crime of murder was complete at the time of the death of
            Alexandra Cerda.

19  (CT. 274.)

20          As explained in Instruction 521, a first degree murder is one which
            is willful, deliberate, and premeditated.   All other murders are
21          classified as second degree murder.

22          The People have the burden of proving beyond a reasonable doubt
            that the killing of Alexandra Cerda was first degree murder rather
23          than second degree murder.  If the People have not met this burden,
            you must find the defendant not guilty of first degree murder.
24
    (CT. 275.)
25

26          You have asked why you were provided with verdict forms related
            to second degree murder.  The law requires that if a jury finds a
27          defendant guilty of a crime of murder, that same jury must
            determine whether the defendant committed first degree murder or
28          second degree murder.

27

1      Penal Code § 1157.

2   (CT. 276.)  These instructions did nothing to clarify the issue to the jury that petitioner had to be

3   convicted under his own *mens rea*, but erroneously, solely focused on the killing by the

4   perpetrator and his *mens rea*, thus perpetuating the faulty language of CALCRIM Nos. 400 and

5   521.

6      Having been unable to obtain elucidation, the jury asked a second mid-deliberation

7   question, written as follows:

8      Under CALCRIM (520) pen. Code 187 the bottom of that page, it
       says "if you decide that the defendant has committed murder, you
9      must decide whether it is 1st or 2nd degree.

10     Also in CALCRIM (189) line 5 it says "you may not find the
       defendant guilty of first degree murder unless all of you agree that
11     the … defendant aided and abetted a willful deliberate and
       premeditated murder.

12
       Question under 401 aiding & abetting – if all jurors agree that
13     conditions 1-4 have been met – do the jurors [] still have the
       discretion to look at the totality of the evidence and make a decision
14     about whether 1st or 2nd degree murder has been committed by Mr.
       Rodriguez?

15
       Or if the test of 401 (aiding & abetting) all four parts are met by all
16     jurors, is it the responsibility of the jurors to require a standard or
       1st degree murder to be upheld?

17

18  (CT. 305-06.)  In response, the court re-instructed the jury with the four elements of aiding and

19  abetting as previously given in CALCRIM No. 401, as well as the following:

20     If you find that the People have proved beyond a reasonable doubt
       that the defendant aided and abetted the crime of murder, then the
21     jury must decide whether *the murder* was willful, deliberate, and
       premeditated (First Degree Murder), or Second Degree Murder.
22     The jury must agree unanimously whether any murder committed
       was First Degree Murder or Second Degree Murder.

23

24  (CT. 278.) (emphasis added)

25     Again, the jury was instructed that it only need look to the murder itself to determine

26  whether petitioner was guilty of first degree murder.  It again assumes that if the murder was of

27  the first degree, an aider and abettor was guilty of that first degree murder.  No instruction as

28  given that the aider and abettor had to know of the full extent of the perpetrator's (Madrigal's)

28

1   premeditation in order to be guilty of the first degree murder.

2          These two mid-deliberation questions indicate the ambiguity in the jury instructions on

3   aiding and abetting because the jury's questions reflect its confusion as to whether it could

4   convict the defendant of the lesser crime of second degree murder in light of Madrigal's

5   conviction of first degree murder.  See Waddington v. Sarausad, 555 U.S. 179, 192 n. 5, 129 S.Ct.

6   823 (2009) ("the defendant must show both that the instruction was ambiguous and that there was

7   a 'reasonable likelihood' that the jury applied the instruction in a way that relieved the State of its

8   burden of proving every element of the crime beyond a reasonable doubt") (citations omitted).

9   Although the jury was specifically instructed that the prosecution had to prove its case beyond a

10   reasonable doubt; see CT. 241; the jury was also essentially told the prosecution had met its

11   burden because the perpetrator was guilty of first degree, premeditated murder.  The jury was

12   sufficiently confused to ask two separate mid-deliberation questions asking whether it was bound

13   to find first degree murder based on Madrigal's conviction, thereby relieving the prosecution of

14   its burden to independently prove petitioner's intent.  Even after the first mid-deliberation

15   question was asked and answered, the jury continued to want direction on the very same issue,

16   indicating that the court had not clarified the issue for the jury the first time around.

17          Not only did the jury pose the aforementioned mid-deliberation questions, but their other

18   questions reflected their confusion as to petitioner's culpability as an aider and abettor in light of

19   the instructions and argument about Madrigal's culpability.  First, shortly after the jury was

20   excused to deliberate, it requested twelve copies of CALCRIM 400 and 401, despite having

21   previously received one copy of the entire set of jury instructions.  (RT. 691, 695.)  The jury also

22   asked:  "at what point is it considered the end of the crime.  Ds charged i.e. time of death;

23   disposal of body, etc." (CT. 285.)  This question was asked at the same time as the jury asked its

24   first mid-deliberation question that is at issue in this habeas, why it was given a choice of second

25   degree murder, if Madrigal was convicted of first degree murder.

26          Furthermore, the prosecutor perpetuated the errors in focusing on the "equally guilty"

27   language and Madrigal's willful intent in her closing argument.  She told the jury,

28

What this guy did was help facilitate a murder, and under the law, *he is as guilty as the person who committed it.   That is the law.* And we all discussed the law and whether or not each juror in this case would follow the law, whether they like the law, whether they agree with the law.  You all said that you would follow the law, and this is the law of aiding and abetting, and he is guilty of a murder.

Is he guilty of first-degree murder?  Is he guilty of second-degree murder?

He's guilty of first-degree murder.  He aided and abetted a first-degree murder.  He aided and abetted a premeditated, willful, and deliberate murder.  By stab one hundred, he knows this is happening, he knows there's an intent to kill, and he is helping that happen by continuing to drive this vehicle.

He drove a homicide scene.  He drove this place, this thing that she was dying in, and he continued to drive it.

Justice.  If you don't – if you don't think that he committed a first-degree murder, you've got a fallback of second-degree murder.  And that's if you found that it was not willful, deliberate, and premeditated.

What he did was aid and abet a first-degree murder.

(RT. 679-80.) (emphasis added).

The prosecutor basically told the jury in no uncertain terms that petitioner, as a facilitator, was as guilty as the perpetrator, and that was the law.  Therefore, petitioner had to be found guilty of first degree murder since it was undisputed that Madrigal was convicted of first degree murder. The prosecutor repeatedly focused on Madrigal's intent instead of petitioner's intent throughout her closing argument.  For example, she argued:

First, the People have to show that Jose Madrigal perpetrated a murder.  And I'm going to pretty much gloss over this pretty quickly because it's clear that Alexandra Cerda was murdered and that Jose Madrigal is the perpetrator of that crime.

The People have to show – and this is where you go to instruction fifteen twenty, because that's the murder instruction.  And this – fifteen twenty only applies to Jose Madrigal.

The People have to show that Jose Madrigal intended to kill Alexandra Cerda; he unlawfully killed her with malice aforethought either express malice, he intended to kill her, or implied malice, he committed an act that was dangerous to human life and he knew he was committing that dangerous act and he did that act with conscious disregard for her life.

Jose Madrigal committed the murder of Alexandra Cerda with both

30

1    express and implied malice.  He clearly intended to commit this
     killing.
2
     When [sic] got into the van, he had the knife with him and he
3    stabbed her very quickly after getting inside of that van one
     hundred and fourteen separate times causing one hundred and
4    twenty separate injuries.

5    There is no question that he intended to kill, no question that he had
     malice aforethought.
6
     The question is was it premeditated, was it willful, and was it
7    deliberate such that Jose Madrigal committed a first-degree murder
     and not a second-degree murder?
8
     That's the difference between second-degree murder and first-
9    degree murder:  Was it willful, was it deliberate, and was it
     premeditated?
10
     And the answer is, yes, it was willful.  He had an intent to kill.  It
11   was deliberate.  He consciously weighed the options for and against
     the killing and decided to kill her anyway.   And it was
12   premeditated.  We know it was premeditated because of the sheer
     length of time it took to kill her.
13
     Was premeditation reached on the fourth stab wound; was it
14   reached on the eighteenth stab wound; how about the twenty-sixth
     or the forty-fifth or the ninety-seventh or the hundred and
15   fourteenth?

16   He had time to reach the decision that he was going to kill her
     before she died.   That is premeditation and it can be reached
17   quickly.

18   So there's this question that the People have shown that the
     perpetrator, Jose Madrigal, committed the crime, not to mention the
19   Court has already explained to you that he has taken judicial notice
     of the fact that Jose Madrigal has already been convicted of a first-
20   degree murder.  He was convicted January 9th, 2009, of the killing
     of Alexandra Cerda with willful, deliberate, and premeditation. [sic]
21

22   (RT. 644-46.)

23   The prosecutor repeatedly referenced Madrigal's actions and state of mind, as well as the judicial

24   notice taken by the court of his first degree murder conviction.

25        When it came to argument about petitioner's role and aiding and abetting, the prosecutor

26   focused on petitioner's knowledge of Madrigal's intent to kill during the time Madrigal was

27   stabbing her, that he was aware of the stabbing while he was driving for about ten minutes, and

28   that he saw Madrigal stab her about ten to fifteen times, fast and hard, while she was still alive.

(RT. 649, 355-56.)  The prosecutor did not otherwise address the intent level required for petitioner, at least as far as petitioner's alleged intent to aid and abet a premeditated murder.  The prosecutor then concluded her closing argument with the statement,

> The fourth element, the defendant's conduct did, in fact, aid and abet.  Absolutely.  Absolutely.  His continuing to drive allowed this murder to happen.  It allowed this murder to happen.  It facilitated it.
>
> The defendant is *equally guilty* with Jose Madrigal in the commission of this murder.  He knew it was happening.  And he did, in fact, intend to and did aid and facilitate this murder, and his actions did allow this murder to happen.

(RT. 660.) (emphasis added).  The prosecutor perpetuated the erroneous language of CALCRIM No. 400 by repeating it at the end of her closing argument.  As also pointed out by petitioner, the prosecutor added in her rebuttal the statements which continued to eliminate the proper intent level required for petitioner to be convicted of first degree murder:

> But we know that [petitioner] knew, and it did not have to be preplanned.
>
> The way it was argued in closing argument by the defense, you would have to think that this was preplanned, and that is not the law.
>
> As long as he knew, as long as Luis Rodriguez knew, that Madrigal intended to kill her in the car, that is enough.

(RT. 676.)

Of course, that might well be true if the only question was whether petitioner aided and abetted a murder, but the critical question here is whether petitioner understood he was aiding and abetting a *premediated* murder.  One cannot reasonably find that the prosecutor's argument cleared up any ambiguity regarding the required *mens rea* for aiding and abetting a premediated murder; rather the argument simply added to the bog of ambiguity.

In sum, there can be little doubt that the jury applied the ailing "equally guilty" instruction in a way that violated the Constitution, especially since other instructions exacerbated the error.  No valid attempt was made by the trial judge to cure the ambiguities that seems so obvious now.  The prosecutor, at times, reinforced the error in final argument.  One can almost see the jurors throwing up their hands when the court failed to recognize a very legitimate confusion.  There can

1   be little doubt that the jury was, in effect, given a mandatory presumption that if it found the

2   perpetrator guilty of first degree murder, and petitioner guilty of aiding and abetting the murder,

3   any other choice for petitioner aside from aiding and abetting *first degree murder* was foreclosed

4   for all intents and purposes because as a matter of law, petitioner was "equally guilty."

5        As related earlier, the Court of Appeal recognized the error in giving the "equally guilty"

6   instruction, but found that error harmless beyond a reasonable doubt.  This latter finding equates

7   with a finding that it was not likely that the jury was misled (even though the jury twice related

8   that it was confused by the patent ambiguity at best, and a direction to find petitioner equally

9   guilty with Madrigal at worst.)  With all the due respect that AEDPA requires of federal courts

10  when reviewing state criminal convictions, the finding by the Court of Appeal *in the*

11  *circumstances of this case* is AEDPA unreasonable.  This brings the question to the harmlessness

12  of the error from a Brecht standpoint.

13       There was plenty of evidence, supplied by the *prosecution*, which pointed to only a

14  joinder, at best, by petitioner with Madrigal in an intent to kill, i.e. second degree murder, as

15  petitioner continued to drive the van during the mayhem.  Petitioner reported that Madrigal

16  beforehand only told him that he wanted to have sex with the victim, not that his intention was to

17  kill her as a payback for a favor he owed.  Petitioner stated that if he had known the truth, he

18  never would have taken him in the van because he didn't "like to be involved in such things."

19  (RT. 376, 387.)  Officer Jimenez thanked petitioner for his cooperation and told him he thought

20  petitioner was telling truth and that he believed him.  (RT. 540, 554, 556.)  Petitioner reported to

21  police that he kept driving because he "got really nervous since [he had] never seen things like

22  that." (RT. 393.)  He reported that he never did anything to the victim.  He stated, "[e]ven if I

23  wanted to do something, that guy [Madrigal] would have done something to me as well.  I don't

24  know him.  I just know him from that night.  Had I tried to do something, he would have fucked

25  me up, too." (RT. 394.)  Petitioner also related that he had not met Madrigal before the night of

26  the murder. (RT. 344-45.)  While this evidence is not dispositive of petitioner's state of mind, it

27  certainly impacts a jury's consideration of whether petitioner was aiding a murder as opposed to a

28  premeditated and deliberate murder.  While there was sufficient evidence (under the low bar set

1   by the law for finding such) that petitioner had sufficient time to clear the blur of events

2   transpiring in the car such that he could be found to be joining in a relatively on-the-spot

3   premeditated/deliberate murder, petitioner was entitled to a fair determination of whether that

4   indeed was occurring *in his mind*.

5     The issue facing the jury here, trying to determine from the evidence presented not only

6   whether an aider and abettor (petitioner) understood that the perpetrator (Madrigal) had evidenced

7   an intent to kill while in the car, but also understood in the avalanche of events that the

8   perpetrator was evincing a premeditated and deliberate intent to kill, was, to put it mildly, an

9   esoteric task—one that would challenge most lawyers not to mention lay jurors.  This task, and

10   hence ultimately the verdict given the evidence of record, was substantially and injuriously

11   harmed by the hopeless ambiguity created when the jury was initially directed to find petitioner

12   "equally guilty" with the perpetrator.

13   CONCLUSION

14     For the reasons stated herein, IT IS HEREBY RECOMMENDED that:

15     1.  Petitioner's application for a writ of habeas corpus be granted in part on the

16   instructional error claim, and be denied on the insufficient evidence claim; and

17     2.  Petitioner's conviction for first degree murder be vacated; and petitioner be given the

18   option of pleading to second degree murder and be sentenced thereon, or be retried with all

19   charges at issue.

20     These findings and recommendations are submitted to the United States District Judge

21   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

22   after being served with these findings and recommendations, any party may file written

23   objections with the court and serve a copy on all parties.  Such a document should be captioned

24   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

25   shall be served and filed within fourteen days after service of the objections.  Failure to file

26   ////

27   ////

28   ////

1   objections within the specified time may waive the right to appeal the District Court's order.

2   Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3   Dated: January 6, 2017

4                                   /s/ Gregory G. Hollows
                          UNITED STATES MAGISTRATE JUDGE
5

6
    GGH:076/rodr2260.hc
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        35